UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,      CRIMINAL NO. 17-20382

v.            HON. BERNARD A. FRIEDMAN

FRANK RYAN JOSEPH,

   Defendant.

_____/

## <u>Government's Sentencing Memorandum</u>

Frank Joseph selfishly took advantage of a 13-year-old girl for months while masquerading as a 17-year-old named Ryan Ikeda. He pressured her into doing things that no 13-year-old should be asked to do. When that wasn't enough, he traveled from Kentucky to Michigan to meet her. After getting her to pay for the room with her dad's credit card, the defendant had sex with her without her consent and went to sleep as she cried in the bathroom. He continued to have sex with her over the course of four days even after she indicated she was uncomfortable. This conduct and the conduct described throughout this memorandum warrants a sentence within the guideline range of **292 to 360** months.

## I.   Factual Background

### A. *MV-1 Reports to Madison Heights Police Department*

In November 2016, a father reported to the Madison Heights Police
Department that his daughter (MV-1) had been sexually assaulted by a 26-year-old
man that she met online. That man turned out to be the defendant Frank Ryan
Joseph. MV-1 told the police that she met the defendant in an online gaming forum
when she was 13 and that they developed an online/telephonic "relationship." The
defendant knew that MV-1 was 13, and he told her that he was 17. MV-1 reported
that the defendant asked her to send nude images and videos to him. She also
reported that he came to Michigan in June of 2016 and stayed in a hotel with her
for several days. MV-1 told Madison Heights police officers that the defendant
raped her in the hotel room.

### B. *Defendant Convinces MV-1 to Send Child Pornography While Pretending to be 17*

Homeland Security Investigations (HSI) completed a forensic review of
MV-1's phone and laptop. They found hundreds of pictures and several videos that
meet the federal definition of child pornography. MV-1 confirmed that she took
those pictures and videos to send to the defendant. They include close-up pictures
of MV-1 spreading apart her vagina with her fingers, pictures of MV-1's naked
breasts, and videos of her engaging in masturbation (including inserting an object
into her vagina). The defendant also sent pictures and videos of his penis to MV-1.

Investigators found hundreds of pages of Skype chats between MV-1 and the defendant spanning from December 2015 through December 2016. In these Skype chats, the defendant repeatedly asked MV-1 to send him nude pictures and videos. Several times, the defendant instructed MV-1 as to what to do in the pictures/videos, including telling her:

- "I demand you send me nude!!!!!!";

- "You can keep your vibrator in though, shove it inside you";

- "Just push it in your pussy and play with your tits and watch me";

- "But make sure to take a nice pic of you in knee highs and panties baby girl";

- "Cum for me you filthy slut";

- "Shove your vibe in [your] ass on fastest and rub your clit until you cum again";

- "You could just let me see your tits and while only having the cam on that part and then use your vibrator while you watch me on cam and I just keep looking [at] those, its [a] way to do something without having to show me anything bc ur a shy baby…looking for workaround for your shyness…well as long as your dad doesn't get up you will be safe that's [the only] thing I am worried about."

Several times, MV-1 displayed a reluctance to send the pictures, but the defendant convinced her to anyway. For example, in December 2015, MV-1 mentioned that she had pictures of her breasts but did not want to send them because she was being "stubborn." The defendant pressured her to send him the pictures, saying "show me…RIGHT MEOW…eternal hard on…I need some relief so don't be stubborn." In January 2016, MV-1 said "I can't stand looking at my body let alone making a video of myself…" but the defendant coaxed her by saying "…Just think about what I'd do to you princess. Because we both know I wouldn't be able to hold myself back from bringing you pleasure." When MV-1 responded that she felt insecure, the defendant said that she "…shouldn't be, I'd love on you from your toes to your waist, why? Because I know how much you want my tongue to satisfy your clit. But after I finish loving you there I'll finish on the rest of you….I'll be waiting beautiful." In other conversations, MV-1 told the defendant she felt sick after looking at herself. A few times, after a sexual conversation, MV-1 told the defendant that she was feeling anxious and wanted to be alone.

In addition to being aware of MV-1's age (13 and then 14), the defendant was aware of her status as a middle school student. When MV-1 said she was trying to do her schoolwork in response to the defendant's sexual conversation, he said "Well at least now you have something to think about. I mean its only fair to

have your panties wet while you think about me pumping load after load of cum into that tight little innocent pussy of yours." This is the way that the defendant spoke to a schoolchild. In some conversations, the defendant appears to discuss having a threesome with one of MV-1's friends. He asked how old the friend was. MV-1 responded that she was 14.

The Skype conversations also suggest that the defendant knew he was doing something wrong. MV-1 and the defendant talked about how someone the defendant knew went to jail, and MV-1 said that she was going to be cautious about telling her friend about the defendant. The defendant agrees and says "shit like that I am paranoid about…honestly I don't want anything happening so I understand/agree…even with the threesome thing I have to be care ful." When MV-1 suggested they run away, he said "umm i don't need jail…unless I have a way to disappear with you with no chance on getting caught."

*C.  MV-1 Finds Out Defendant's Real Age*

In March 2016, MV-1 found out that the defendant was not 17 and that he had a child. At that point they had been talking online for five months. The defendant had never mentioned to MV-1 that he had a child before, despite the fact that he called her his "girlfriend" and said that he loved her. The defendant also did not tell MV-1 his real name. During their communications, he used the name Ryan Ikeda. In a forensic interview with HSI personnel, MV-1 reported that after she

found out the defendant's true age, the defendant threatened to commit suicide if she broke up with him. MV-1 said that she continued to communicate with the defendant after that because she cared about him and did not want him to harm himself.

### D. Defendant Comes to Michigan and Sexually Assaults MV-1

In June 2016, the defendant came to Madison Heights on a greyhound bus from Kentucky to meet MV-1 at a hotel. They stayed in the hotel for four days. The defendant was aware that MV-1 used her dad's credit card to pay for the room and their food.

While at the hotel, the defendant had sex with MV-1 without her consent. MV-1 described to the forensic interviewer that the defendant started kissing her and started having sex with her even though she did not want him to. He never discussed with MV-1 whether she wanted to have sex with him. After he had sex with her, MV-1 began to cry. She told the defendant she did not feel good about what happened. The defendant went to sleep, so MV-1 went to the bathroom and continued to cry. The defendant continued to have sex with MV-1 multiple times over the four days.

### E. HSI Executes Search Warrant and Defendant Tries to Lie

HSI executed a search warrant at the defendant's residence. He agreed to be interviewed. Initially, he was untruthful with the agents and tried to say that he and

MV-1 did not have sex when he was in Michigan, but just went to the park and took pictures. He denied getting a hotel room with MV-1. When the agents told the defendant they knew he was not being honest, he admitted to renting a hotel room and having sex with MV-1.

The Washtenaw County Sherriff's Office completed a review of the defendant's devices. On the defendant's laptop, investigators found hundreds of images of MV-1 either nude or in sexually explicit poses. They also discovered images of three additional girls in sexually explicit poses. Those girls have not been identified, though they appear to be minors.

### F. Federal Charges and Rule 11 Plea Agreement

A grand jury issued a five-count indictment charging the defendant with (1) Production of Child Pornography; (2) Receipt of Child Pornography; (3) Possession of Child Pornography; (4) Coercion and Enticement of a Minor; and (5) Travel with Intent to Engage in Illicit Sexual Activity. The defendant entered a guilty plea to Count One, Production of Child Pornography, in violation of 18 U.S.C. § 2251(a). That offense carries a mandatory minimum of 15 years' imprisonment and a maximum of 30 years' imprisonment.

## II.   The Guideline Range is 292-360 months

Section 2G2.1 of the sentencing guidelines applies to violations of 18 U.S.C. § 2251(a). Under § 2G2.1, the base offense level is 32. The defendant does not

dispute the three two-point enhancements applied for (1) minor between the age of 12 and 16; (2) the commission of a sexual act or sexual contact; and (3) the use of a computer, which together result in an offense level of 38. He does dispute the Chapter Four Enhancement for a pattern of activity involving prohibited sexual conduct with a minor. Both the government and the probation department believe this enhancement applies here.

Section 4B1.5(b) applies where a defendant's instant offense of conviction is a covered sex crime and the defendant engaged in a pattern of activity involving prohibited sexual conduct. U.S.S.G. § 4B1.5(b) (2018). There is no dispute that the defendant's offense of conviction is a covered conviction. The defendant disputes that he engaged in a pattern of activity involving prohibited sexual conduct and argues that his actions constituted a single course of conduct. That argument is not supported by the law. A pattern of activity occurs "if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, cmt. n. 4(B)(i). Prohibited sexual conduct includes the production of child pornography. *Id.*, cmt. n. 4(A)(b)(ii).

The Sixth Circuit has held that the plain language of § 4B1.5(b)(1) and its application note apply to defendants who abuse only a single victim. *United States v. Brattain*, 539 F.3d 445, 448 (6th Cir. 2008). Defense counsel attempts to distinguish this case from *Brattain* by pointing out that Brattain sexually abused

his daughter over a seven-year period. That distinction is irrelevant since all that is required by the guidelines are "two separate occasions." U.S.S.G. § 4B1.5, cmt. n. 4(B)(i). In this case, the defendant engaged in prohibited sexual conduct with MV-1 on much more than two separate occasions. From November 2015 through at least November 2016, the defendant requested nude images and videos from MV-1 countless times. On several occasions, the defendant instructed MV-1 as to what to do on a video camera. These are just a few examples:

- On January 9, 2016, the defendant instructs MV-1 "harder in your pussy…go haderand faster u whore…cameera on ur tits slut…cum."

- On May 5, 2016, the defendant says "cum for me you filthy slut."

- On June 28, 2016, the defendant instructs MV1 "lie on your side and let me watch play with your pussy and your ass from that angle."

The occasions above are more than sufficient to establish a pattern of activity and the provisions of § 4B1.5(b) apply. Therefore, the defendant's offense level is increased by five to 43. With acceptance of responsibility, his total offense level is 40, resulting in a guideline range of 292-365. Because the statutory maximum is 360 months, the defendant's guideline range is **292-360 months**.

### III.    The Factors Under 18 U.S.C. § 3553(a) Warrant a Guideline Sentence

Title 18, Section 3553(a) of the United States Code provides the relevant objectives and factors to be considered by sentencing courts when determining a

"sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors to the defendant's case are evaluated below.

### A. Background on Sentencing Guidelines in Child Pornography Cases

The legislature has the ability to endorse or reject the guidelines and the way they are calculated for every category of offenses. And, Congress has very clearly endorsed the guidelines as they now stand for child pornography offenses. "Congress has taken an active role" in determining appropriate guidelines for these types of offenses. *United States v. McNerney*, 632 F.3d 772, 775 (6th Cir. 2011). In 2003, Congress passed the PROTECT Act, responding to the inadequacy of sentences in child pornography cases. *See* H.R. Rep. No. 108-66, 108th Cong., 2nd Sess. 58-59 (2003). And, in 2012, Congress passed the Child Protection Act, which increased the maximum punishment for certain child pornography offenses.

As the Sentencing Commission noted, "[f]or more than 30 years, and particularly in recent years, Congress has focused attention on the scope of child pornography offenses and the severity of penalties for child pornography offenders. Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly communicated its will regarding appropriate penalties for child pornography offenders. Congress expressed an intent to raise penalties associated with certain child pornography offenses several times through directives to the Commission and statutory changes aimed at increasing the guideline penalties and reducing the incidence of downward departures for such offenses." HISTORY OF CHILD PORNOGRAPHY GUIDELINES, at p. 6 (2009). [1]

While the Guidelines are advisory and courts are permitted to vary from them on a policy basis, variances will be "scrutinized closely." *United States v. Herrera-Zuniga*, 571 F3d 568, 585 (6th Cir. 2009); *see also United States v. Rita*, 551 U.S. 338, 350 (2007) ("[I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives.").

---

[1] It is Congress and not the Commission that has the ultimate authority with respect to the Guidelines. As the Sixth Circuit noted, "the Constitution merely tolerates, rather than compels, Congress's limited delegation of power to the Commission." *United States v. Bristline*, 665 F.3d 758, 762 (6th Cir. 2012).

And given Congress's active role in the sentencing guidelines for child

pornography offenses, such a disagreement takes on a "formidable task":

> [I]t is [] Congress's prerogative to dictate sentencing enhancements
> based on a retributive judgment that certain crimes are reprehensible
> and warrant serious punishment as a result. When a congressional
> directive reflects such a judgment, a district court that disagrees with
> the guideline that follows must contend with those grounds too.  Thus,
> when a guideline comes bristling with Congress's own empirical and
> value judgments – or even just value judgment – the district court that
> seeks to disagree with the guideline on policy grounds faces a
> considerably more formidable task than the district court did in
> *Kimbrough*. A court that disagrees with § 2G2.2 must take on this
> formidable task.

*Bristline*, 665 F.3d at 764.

A guideline sentence in this case satisfies the objectives of 18 U.S.C. §

3553(a).

B. *Nature and Circumstances of the Offense*

The production of child pornography is an incredibly serious offense.

Children, unlike adults, are unable to consent to sexual activity because they

simply cannot comprehend the consequences of their actions in the same way that

an adult can. Simply put, the defendant took advantage of a child. And the way in

which he did so was by manipulation and deception. He deceived MV-1 into

believing that she was in a relationship with a fellow teen. Then, he manipulated

her over and over again to get what he wanted – explicit videos and pictures of her.

The defendant knew that MV-1 was especially vulnerable due to her age and

mental health issues, which the two discussed frequently. He exploited those vulnerabilities for his own sexual gratification. His actions were those of a selfish predator.

Congress has set the mandatory minimum punishment for this type of crime at 15 years. That means that one picture of sexually explicit behavior involving a minor warrants a 15-year custodial sentence. But here, the defendant convinced MV-1 to send him pornographic videos and photos over a period of several months. He received hundreds of pictures. He took advantage of MV-1 over and over, every day, for months.

And the defendant's behavior was not limited to the Internet. He came to Michigan from Kentucky to engage in sexually explicit behavior with a 14-year-old, something he knew was illegal and could result in a lengthy sentence of imprisonment. Then, when he got to Michigan, he physically violated MV-1 by having sex without her consent. To be clear, a minor cannot consent to sexual activity, but MV-1 did not even indicate that she was okay with what was happening. She was so distraught afterward that she sat in the bathroom alone and cried. The defendant had no regard for her feelings or for how these events would impact MV-1's life and her family's life. After the incident, MV-1 fell behind in school and suffered adverse consequences to her mental health. The defendant's

cruel and selfish actions will have a lasting impact on her. He let his sexual desires and impulses drive his actions while simultaneously destroying MV-1's life.

### C.      History and Characteristics of the Defendant

The defendant's criminal history is minimal – his only conviction is for possession of marijuana, and the use/possession of drug paraphernalia. (PSR ¶ 36.) But his actions in this case demonstrate a repeated disregard for the law and a gross callousness to the fragile wellbeing of a child. Though the defendant claims he was in love with and in a relationship with MV-1, his behavior is completely inappropriate and damaging. As an adult, he knew better than to get into a sexual relationship with a 13-year-old. He also had nude pictures of other girls on his devices, which call into question the legitimacy of his claims that he believed he was in a committed relationship with MV-1.

Further, after being arrested for this offense, the defendant continued to contact MV-1 from jail. Even his detention could not deter him from causing harm to this victim. His history and characteristics warrant a guideline sentence.

### D.      Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense

Child pornography offenses are extremely serious because they both result in perpetual harm to victims and validate and normalize the sexual exploitation of children. Courts across the country have recognized this:

There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics, surrounding child pornography, we are living in a country that is losing its soul. Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease.  However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions.  Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).

In passing 18 U.S.C. § 2251, Congress similarly described the evil of child pornography:

 [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . .

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

The defendant has no respect for the law. He knew what he was doing was wrong and illegal, yet he continued to do it for months. A guideline sentence is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offense.

E.      *Adequate Deterrence and Protection of the Public*

Deterrence with respect to child pornography offenses is of particular import because of the high recidivism rates for these types of offenders. *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009) (compiling congressional statements regarding the high risk of recidivism among child sex offenders); *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006); *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011) ("We need evidence-driven law just as we need evidence-driven medicine . . . statistical analysis of sex crimes has shown that the best predictor of recidivism is not deportment at an interview but sexual interest in children.") (citations omitted).

By deterring the individuals who not only produce child pornography online but take a step further to commit hands-on offenses, courts can help prevent the sexual exploitation of children. The public deserves to be free from the fear that their children will meet predators online who will travel across state lines to have sex with them.

## IV.    Restitution

The government is working with the victim and her family to ascertain the amount of their losses, but asks that the Court to set a final date for a determination of the victim's losses not to exceed 90 days after sentencing, pursuant to 18 U.S.C. § 3664(d)(5). The government will also work with defense counsel to reach an agreement in advance of that date.

## V.    Conclusion

The government recommends a sentence within the guideline range of 292-360 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Amanda Jawad*
Amanda Jawad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9116
E-Mail: amanda.jawad@usdoj.gov

Dated: January 4, 2019

## Certificate of Service

I hereby certify that on January 4, 2019, I electronically filed the Sentencing

Memorandum for the United States with the Clerk of the Court of the Eastern

District of Michigan using the ECF system which will send notification of such

filing to the following via electronic mail:

Todd Shanker
Attorney for Defendant

*s/Amanda Jawad*
Amanda Jawad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9116
E-Mail: amanda.jawad@usdoj.gov