UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                        CR. NO.   17-20382

   v.

                        HONORABLE Bernard A. Friedman

FRANK JOSEPH,

        Defendant.

_____/

## SENTENCING MEMORANDUM
## ON BEHALF OF FRANK JOSEPH

    Frank Joseph, 28 years-old with no prior felony convictions, has never been to jail or prison before this case.   He pled guilty to production of child pornography (CP) pursuant to a Rule 11 Agreement with a guideline range of either 292-360 (government and probation's calculation) or 168-210 months (defendant's calculation).   Based on either calculation, counsel respectfully requests a sentence of 15 years, a term that is sufficient, but likely greater than necessary for this first time offender who is described by expert psychologist Jeffrey Wendt as a "low-to-moderate risk" **without treatment**; and with appropriate mental health & substance abuse treatment he will pose an even lower risk.

1

Dr. Wendt determined that Mr. Joseph is not a pedophile.   He is a young man who experienced unconscionable emotional and physical abuse throughout his life; who was surrounded by racism in his small Kentucky community, making him feel like an outsider in his own town, even his own family.   As Dr. Wendt emphasizes, due to his abusive upbringing, at the time of the offense, Joseph was substantially immature for his age (24 at the time of the offense) and craved the love he had never experienced. It's no wonder that his connection with MV-1 began through a fantasy video game. Joseph fell in love with MV-1 after they both shared very personal information about their struggles.   Dr. Wendt concluded that Mr. Joseph engaged in the offense conduct because of "poor judgement associated with an emotional need for acceptance rather than the expression of specific pedophilic interest…" *See*, Evaluation by Dr. Jeffrey Wendt, Ph.D, Exhibit 1.   All that said, without question, Joseph's initiation and continuation of a relationship with 14 year-old MV-1 was not only inappropriate it was a serious crime.

While this Honorable Court must certainly consider the advisory guideline range pursuant to Section 3553(a)(2), counsel is respectfully requesting a downward

variance to the 15-year mandatory minimum (or a within guideline sentence if the court finds defendant's calculation to be correct).[1]

**USC §3553(a) Sentencing Factors**

## I.   Frank Joseph's Social History and Needed Medical and Mental Health Services

Mr. Joseph was born in Harlan, Kentucky, where the population in 2018 was still 95.9% White, and then he later moved to Leslie County, Kentucky, where the population in 2018 was 98.4% white.[2]  Mr. Joseph was the only black person in his neighborhood, in his school, and the only black person in his own family. Of course being part of such a significant racial divide would be difficult in most communities, but it was even more difficult in Harlan and Leslie, Kentucky, both in Appalachia, which carries a deep racial divide and is a state where racial slurs have a place in school among both teachers and students, and where a threat on your life is not uncommon if you are black.

---

[1] MV-1 clearly stated during her "Carehouse Interview" with Agents that she did not want to see Joseph locked up for even 15 years.

[2] U.S. Census Bureau (2018). QuickFacts Leslie County, Kentucky; Harlan County Kentucky. Retrieved at https://www.census.gov/quickfacts/fact/table/lesliecountykentucky,harlancountykentuck/PST045218.

In 2017, the median income in Leslie County, KY, where Mr. Joseph spent his later adolescent years, is approximately $27,000 per year, and the high school graduation rate is only 68%.[3]  Services for children and for mental health care are scarce. Moreover, the lack of diversity has led to discrimination and animosity against non-white individuals. Kentucky also has a statewide presence of the Church of the National Knights of the Klu Klux Klan[4], which has further infiltrated the attitude across the state towards minority groups.

Mr. Joseph's mother, Barbara, was born and raised in Harlan, Kentucky. She grew up in an all-white community and was taught that black people were lesser beings merely because of the color of their skin. To make matters worse, according to Mr. Joseph's maternal grandmother, Francine Rowe, he was conceived after his mother was reportedly raped by a black man while she was away at college. Although this story has never been confirmed, Mr. Joseph grew up believing he was a "rape baby," which is what his own family called him as a nickname.

Mr. Joseph was born premature at 26 weeks, weighing a mere 3 pounds. He was diagnosed at birth with Hemophilia A, a serious genetic condition, which prevents his blood from clotting properly. As an infant, he and his mother lived in a

---

[3] Id.
[4] Southern Poverty Law Center, www.splcenter.org

4

small home next to his grandmother, Francine. A few months after his birth, his mother met Mr. Joseph's stepfather, Frank Joseph, who had 3 children from a previous relationship.

Mr. Joseph's stepfather, Frank, was an unapologetic, overt racist, who raised his children to have the same values. He refused to accept Mr. Joseph as his own child and never treated him like a human being. He was verbally, emotionally and physically abusive towards Mr. Joseph, and Barbara sat on the sidelines and watched him endure years of mental torture and physical abuse. Barbara herself made it clear that she was ashamed of her son simply because of the color of his skin.

Mr. Joseph reported that his stepfather's physical abuse was severe, even having knocked his teeth out after pushing him into a wall, but the emotional abuse he went through was much worse. His stepfather called Mr. Joseph names, laughed at him, and made him sleep in the basement or in a closet, while his step-siblings slept upstairs in a bedroom. He routinely called Mr. Joseph a "ni**er" and "black son of a bitch," and always reminded him he was a "rape baby" who was "worthless."   He encouraged his birth sons to bully Mr. Joseph, and the three of them often talked about the Klu Klux Klan in Mr. Joseph's presence. Mr. Joseph remembers each and every beating he ever received. He also remembers that he was

never taken to the hospital for any medical care after being beaten, and remembers how his mother never came to his rescue.

Unfortunately, school was no escape from the horrors of Mr. Joseph's home life. From the moment he stepped foot on the school bus, racial slurs and remarks were launched at him. He was the only Black person to ride the bus and the only Black person in his class. He grew accustomed to the racism over the years, but he never made friends and isolated himself at school and at home. Mr. Joseph had never experienced a close relationship with anyone, even his own family.

Although school was very important to Mr. Joseph, and he showed great talent in art, he found it difficult to excel in school given the chaos at home and the antagonistic environment at school. On three different occasions as a teenager, he was removed from his home by Child Protective Services (CPS) due to abuse, and was placed into foster care.

The first time he was removed from his home, was after his father physically beat him and pushed him onto a pile of sheetrock. After being hospitalized, Mr. Joseph was placed at Cabin Creek Boys Home. He returned home within a couple of months. Mr. Joseph was 15 or 16 years old when he was removed from his home for a second time as a result of physical abuse and placed into foster care.

In addition to being removed from his home by CPS, Mr. Joseph spent time at the Sewell Center for Children and Families as a result of attempts at self-harm. Given all of the abuse he endured as a child, it is not surprising that Mr. Joseph developed depression during adolescence. He began to believe that life would never bring him any happiness. He stopped caring about himself altogether. At times, he cut himself in an attempt to sooth his emotional anxiety and to feel *something* other than sadness, even if it was pain. By age 16, all of the resentment, self-loathing and pain led to Joseph driving a screw driver through his wrist. At age 17, Mr. Joseph attempted suicide by overdose.

Once Mr. Joseph turned 18, he was determined to get away from his mother and stepfather. Although he remained close with his grandmother, Francine, he lived on his own and began to carve out a life for himself. He was determined to finish high school, after having to drop out. He found different jobs through temp agencies, and returned to school and obtained his GED at the Laurel County Adult Education and Literacy Center when he was 23 years old. *See*, Exhibit 2, GED Transcript. Mr. Joseph found a job, secured an apartment for himself, and eventually wanted to go back to school. Despite his efforts, he was still very much a lost individual, who needed guidance, support and nurturing after the trauma he endured.

A. <u>The Impacts of Childhood Abuse</u>

The reality of child maltreatment is that its long-term effects impact the biological and cognitive development, and on the development of self.[5]  Aside from the loss of trust, one of the most significant effects of psychological trauma is difficulty with regulating the intensity of feelings and impulses. Mothers or other caregivers play this critical role in helping children and young adolescents regulate their emotions by providing a balance between the soothing and the stimulating.[6] When this is absent, as it was for Mr. Joseph, the brain can develop abnormally. As highlighted in the attached report written by Dr. Jeffrey Wendt, Ph.D., Mr. Joseph has developed issues with emotional regulation and emotional immaturity, which are both attributable to the abuse he suffered and his mother's utter disregard for his emotions. *See,* Evaluation by Dr. Jeffrey Wendt, Ph.D., Exhibit 1.

Additionally, children who are maltreated, like Mr. Joseph, physically suffer damage to their growing brains. This too has psychological implications, such as emotional, social or cognitive impairments, which often manifest later into high-risk behaviors. For example, for children, like Mr. Joseph, who become severely

---

[5] Van der Kolk, B.A., Fisler, R.E. *Childhood abuse and neglect and loss of self-regulation*, Bulletin of the Menninger Clinic; Spring 94, Vol. 58 Issue 2.
[6] Id.

depressed because of the child abuse they endure, they become more statistically likely to abuse alcohol and/or drugs. The type of maltreatment, the frequency and duration, the severity, and the relationship to the perpetrator all impact the long-term consequences of the abuse.[7]  In addition, a child's future resilience is connected to how the child's family and community help to build a the child's self-esteem, individuality within a family, intelligence, emotional regulation, humor, and independence.[8]

Mr. Joseph was in severe emotional distress from the time he was a young child, all the way through to his teens. As a black person, he lived in a racist family in a racist community.   His home was a hostile environment, and his mother made no effort to protect him from the abuse he suffered. Mr. Joseph was also not able to build resilience to his abusive childhood because he lacked a caregiver capable of helping him build his self-esteem, and provide the nurturing he needed to balance his emotional instability.

---

[7] Id.
[8] Id.

B. <u>Dr. Wendt's Psychological Evaluation</u>

Dr. Jeffrey Wendt, Ph.D. conducted a psychological evaluation of Mr. Joseph to address diagnostic concerns, future risk, and treatment recommendations. Part of his evaluation was to determine if Mr. Joseph had pedophilic interests and if he was a risk for recidivism. Dr. Wendt concluded that Mr. Joseph engaged in the offense conduct because of "poor judgement associated with an emotional need for acceptance rather than the expression of specific pedophilic interest..." *See*, Ex. 1 - Evaluation by Dr. Jeffrey Wendt, Ph.D. Additionally, Dr. Wendt concluded that Mr. Joseph suffers from both a significant mood disorder, specifically Major Depressive Disorder, and a personality disorder, Borderline Personality Disorder. It was the combination of these two disorders, along with his horrible life as a child and teenager, which ultimately formed his poor decision making in this case.

Mr. Joseph is not a pedophile preying on children, but instead, as Dr. Wendt points out, is a significantly immature young man, who developed issues with emotional regulation and relationships, all of which are linked to the maltreatment he experienced in his early life. *See,* Ex. 1.

This is further supported by the fact that the victim, while no doubt a teenager, did not appear physically as prepubescent. This point is certainly not made in an effort to justify any of his crimes. However, it does underscore that Mr.

Joseph's connection with the victim in this case was based on his need for an emotional relationship in accord with his own emotional immaturity, rather than an attempt to seek out young girls who appear physically and developmentally very young or pre-pubescent, which is characteristic of a typical pedophile.

Altogether, Dr. Wendt concludes that both Mr. Joseph's mood disorder and personality disorder can be treated through a combination of psychotropic medications, psychotherapy and Dialectical Behavioral Therapy (DBT). Dr. Wendt also concluded that his psychological testing indicated a positive prognosis for treatment.

C. Medical Condition

Mr. Joseph has Hemophilia A or Factor VIII deficiency, which requires ongoing treatment and medication. Hemophilia A is a genetic disorder that prevents the blood from clotting properly. As a result of this condition, Mr. Joseph is subject to prolonged bleeding episodes that can be life-threatening. The bleeding episodes can be either external or internal, and any physical trauma has to be taken very seriously. Since birth, Mr. Joseph has been receiving treatment through the University of Kentucky Hemophilia Treatment Center in Lexington, Kentucky. The Hemophilia Treatment Center have nurses who traveled to Harlan and Leslie Counties to serve Mr. Joseph and others in his area who suffer from bleeding

disorders. They have known Mr. Joseph for his entire life and have helped him manage his serious condition. Since he has been incarcerated, the Hemophilia Treatment Center has tried to work with the Federal Detention Center to ensure Mr. Joseph has the proper medication on hand in the event he experiences any physical trauma. It will be imperative for the Bureau of Prisons to have the proper medication on hand to administer should Mr. Joseph have a bleeding episode (either externally or internally).

## II.   The Nature and Circumstances of the Offense

There is no question that Mr. Joseph has been convicted of a serious offense. Based on the evidence from both Mr. Joseph and MV-1, there seems to be no question that they loved each other - however immature they both were, and however illegal the relationship was for Joseph. His history shows no signs of interest in underage girls outside of this case. A review of his electronic devices did not show volumes of child pornography as is typical in cases involving production of child pornography. There was no prepubescent material; there was no sado-masochism; there were no other victims. The two communicated often on various social media platforms; those chats indicate that Mr. Joseph consistently supported and encouraged MV-1 through the throes of her own mental illness.

Joseph met MV-1 in November of 2015 while playing the online game, League of Legends. Online gaming has become extremely popular for both adolescents and adults, and is often a forum for social networking. People may spend hours playing a game with others, and, as a result, may develop relationships and friendships with people who they meet online. The games bring people with the same interests together, sometimes regardless of age.

Mr. Joseph was not seeking out an underage girl to exploit, when he began playing League of Legends; rather, he was among a group of people playing an online game together, who bonded over the social outlet they all enjoyed. Mr. Joseph and the victim in this case made a connection because of their similar interest in the online game. Starting on December 18th, 2015, Mr. Joseph and the MV-1 began to regularly communicate. They realized they not only shared a love for League of Legends, but also shared similar life experiences and struggles, most notably depression and self-harm. MV-1 had already had sexual partners and was open about this in their conversations. However, after Joseph learned her age, he still made the terrible decision to establish an inappropriate relationship with the victim.

In March 2016, three months before Joseph traveled to Michigan to be with MV-1, he told her that he was 24 years old and that he had a young son. See PSR,

13

Par. 12; Carehouse Interview with MV-1, 1/20/2017. Throughout their relationship, even up to the very day of his arrest, she kept in contact with him. The two constantly spoke of their love for each other, even discussing marriage and a family (including Mr. Joseph's son Aidan).    After the June 2016 meet, the two continued corresponding off-and-on; the two eventually broke up, but they continued to communicate all the way up to the day the defendant was arrested. On May 1st, 2017, the two continued to discuss their love for one another. After Joseph was taken into custody on May 2, 2017, MV-1 sent Joseph several emails. Joseph stipulated to a protective order curtailing those communications.

Mr. Joseph takes full responsibility for his actions in this case. He knew what he did was wrong but did so anyway because of his "lifelong pursuit of acceptance." *See,* Exhibit 1, Dr. Wendt, Evaluation.

A. MV-1 Carehouse Interview, 1/20/2017

In her Carehouse Interview, MV-1 stated several times that when she spoke with Madison Heights Police in December 2016, she "exaggerated" her claim about Mr. Joseph forcing himself on her in June of 2016. She did so because she was "very spiteful" (her words) that he had cheated on her. She stated that after she told Madison Heights about their relationship, she had a "mental breakdown."

14

MV-1 described their sexual encounter in June 2016.   She stated that the first time they had sex, she did not want to do so, but did not say anything to Joseph. She said that afterwards, she felt uncomfortable. Mr. Joseph consoled her with hugs; after they went to bed, Joseph fell asleep. That is when she went to the bathroom and cried.   MV-1 stated that the other times they had intercourse, it was consensual (though of course illegal under the law because MV-1 could not legally consent to sexual conduct). MV-1 stated that there were no nude photos taken over their weekend together, but that she took several photos of Joseph that weekend.

MV-1 was also asked to review photos obtained from **MV-1's** electronic devices.   MV-1 stated the 1st photo, of a man, was not Frank Joseph. The second photo was of a female chest (though not sexually explicit).   MV-1 identified the photo as herself, but stated that she took it "years ago" and sent it to her ex-boyfriend not Mr. Joseph.   The 3rd photo was of a man (not explicit). MV-1 stated that it depicted Mr. Joseph, and that she had taken the photo.

The 4th photo was of male genitalia.   MV-1 firmly stated that it was not Mr. Joseph's genitalia, but rather a photo that another man had sent her in the past. The 5th photo was again of male genitalia. MV-1 stated that she could not say that the photo showed Joseph's genitalia. The 6th and final photo was of female genitalia. She said she was "pretty sure" that she took the photo and sent it to

defendant.    MV-1 added that she had sent similar explicit photos to others, both before and after her relationship with Mr. Joseph.    The government's claim that all the explicit photos on MV-1's computer related to her relationship with Mr. Joseph is not simply not credible.    As the above statements make clear, MV-1 had sent and received explicit photos from other men.

Significantly, several times during the Carehouse interview in 2017, MV-1 states that she does not want Mr. Joseph to go to jail for 15 years.

B. Plea Negotiations

This Honorable Court should also know that counsel met with the Government several times about the production charge.    Counsel argued that the Production charge was not warranted in this case given the facts and equities. Eventually, the Government did offer to reduce the production charge if Joseph could recall the password on his phone. This was after the Government had performed a forensic examination, and over a year after his arrest. The password apparently did not work. This doesn't change the fact that this case lacks the hallmarks of most production cases. This case does not involve distribution of

16

images to others, additional victims 9, or non-pornographic evidence of predatory

behavior – such as multitudes of social media photos of young girls.

## III.     Punishment, Deterrence, and Protection of the Public

Without a connection to community values, sentencing guidelines are

unprincipled, and sentences themselves result in "public misunderstanding of the

relative seriousness of criminal conduct, undermine the criminal law's moral

standing, and diminish the criminal law's normative force." See, Paul H. Robinson

et al., *The Disutility of Injustice* 60 (Univ. of Pa. Law Sch. Pub. Law Research

Paper No. 09-24 2009), available at http://ssrn.com/abstract=1470905.

Federal District Court Judge James S. Gwin, in conjunction with other

Federal Judges in Ohio, performed a study of the recommended sentences of

Federal juries following conviction *after trial*, as a way of attempting to gauge the

legitimacy of the Federal Sentencing Guidelines and their ability to generate a just

sentence from the perspective of the community.   The study revealed that "the

median Federal Sentencing Guidelines recommended sentence [in this case either

189 or 326 months] is four and a half times the median juror-recommended

---

9 Four additional nude photographs were found. The Government did not identify
any of the individuals in the photos.   The parties differ as to their opinions on the
ages of those depicted.   Nonetheless, there is no evidence the photos constitute
child pornography.

sentence [which in this case would be either 42 or 72.4 months].”    See, Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?* 4 (Harvard Law & Policy Review 2010), at 192.

In *United States v. Collins*, 828 F.3d 386 (6th Cir. 2016), the Sixth Circuit upheld a downward variance from 207-257 months to the five-year mandatory minimum in a serious CP distribution case **after a jury trial**.    The defendant's guidelines in *Collins* were 267-327 months. *Collins, Id*. at 388. The district judge in *Collins* polled the jury as to what would be an appropriate sentence.    Every juror answered somewhere between probation and 60 months, with a mean of 14.5 months and a median of 8 months.    And again, that was for a CP case with guidelines of 267-327.    The judge then sentenced Collins to the mandatory minimum five-year term.

Counsel is not arguing that this Court should sentence Joseph to 42 or even 72 months, as these sentences are obviously below the mandatory minimum of 180 months.    But counsel is advocating that based on all of the factors under Section 3553(a), a sentence of 180 months – the statutory floor – is more than enough to satisfy the goals of punishment, deterrence and protection of the public pursuant to Section 3553(a)(2).

18

A sentence of 15 years for a first-time offender like Joseph will provide

general and individual deterrence.    In addition to the weight of that sentence,

Joseph has already suffered private and public humiliation from this conviction; has

been threatened in jail; will have to register as a sex offender; and must undergo

strict community supervision with a variety of difficult conditions. He has also

obtained his first felony conviction, and will have to contend with the multitude of

collateral consequences involved with a felony CP conviction. In sum, a 180-month

sentence provides an effective deterrent to any future criminal conduct by the

defendant or any other individuals who would actually consider committing the

instant offenses – at least to the extent possible. [10]

## IV.    Sentence Disparities

A sentence of 15-years imprisonment would not create any unwarranted

---

[10] "The social science literature suggests that potential offenders commonly do not know the law, do not perceive an expected cost for a violation that outweighs the expected gain, and do not make rational self-interest choices." Paul H. Robinson & John M. Darley, *The Role Deterrence in the Formulation of Criminal Law Rules: At Its Worst When Doing Its Best*, 91 Geo. L.J. 949, 951 (2003); *in accord* Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67 (2005).

sentencing disparities among defendants with similar records and similar conduct. See PSR, Par. 88.   Numerous first time CP production defendants have been sentenced to the mandatory minimum, both in this district and nationwide.

## **CONCLUSION**

Mr. Joseph, a 28-year-old man who engaged in an inappropriate and unlawful relationship with a teenager, is not a criminal with pedophilic interests. He *is* an emotionally immature man who committed a serious crime while seeking an emotional connection to another person – after years of isolation, racism, and severe emotional and physical abuse.   He is a young man with a good work ethic, a son, Aiden, whom he cares for deeply, and has never spent a day in jail prior to his arrest on this case. MV-1, during her Carehouse Interview with agents, stated several times that she did not want to see Mr. Joseph locked up for even 15 years.

For all these reasons, Counsel respectfully requests a 15-year term of imprisonment.

Respectfully Submitted,

FEDERAL DEFENDER OFFICE

s/ Todd A. Shanker
**Attorney for Frank Joseph**
613 Abbott St., 5th Floor
Detroit, MI 48226
(313) 967-5879
Dated: January 4, 2018       Email: Todd_Shanker@fd.org

20

## <u>CERTIFICATE OF SERVICE</u>

On January 4, 2018, I filed the foregoing Memorandum with the Clerk of the Court with two exhibits under seal; the parties will be served via email.

Amanda Jawad                    Richard Rogala
Assistant U.S. Attorney         US Probation Officer


<u>/s Todd Shanker</u>
Deputy Defender